**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| **YU WU** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. _____** |
| ) | |
| **EQUIFAX INFORMATION SERVICES, LLC** ) | |
| SERVE:  Corporation Service Company, Reg. Agent ) | |
| 2626 Glenwood Avenue, Suite 550 ) | |
| Raleigh, NC 27608 ) | |
| ) | |
| and ) | |
| ) | |
| **EXPERIAN INFORMATION SOLUTIONS, INC.,** ) | |
| SERVE:  CT Corporation System, Reg. Agent ) | |
| 160 Mine Lake Ct Ste 200 ) | |
| Raleigh, NC 27615-6417 ) | |
| ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Yu Wu, by counsel, and for his Complaint against Defendants Equifax Information Services, LLC ("Equifax) and Experian Information Solutions, Inc. ("Experian"), he states as follows:

### PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2. Equifax and Experian are two of the USA's major consumer reporting agencies (hereinafter, Equifax and Experian are collectively referred to as the "CRAs" or "CRA Defendants").

3. The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

4. Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

5. The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

6. The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Bank of America, N.A. ("Bank of America"—

the information "Furnisher" in this case), particularly when a consumer makes a dispute about information reported.

7.      Plaintiff brings claims under Section 1681e(b) against Equifax and Experian because each reported inaccurate and derogatory account information about Plaintiff regarding an account with Furnisher Bank of America. When Plaintiff disputed the inaccuracies, Equifax did not reasonably investigate, also violating Section 1681i.

8.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax, Trans Union, and Experian have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax, Trans Union and Experian have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

10.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) & (2). All Defendants are residents of this District and Division and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Division.

11.     The account at issue in this case is an account with Bank of America. Bank of America is a bank and financial services holding company headquartered at the Bank of America Corporate Center in Charlotte, North Carolina.

## PARTIES

12.     Plaintiff is a natural person residing in the State of Texas, and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c).

13.     Equifax is a foreign limited liability company authorized to do business in the State of North Carolina through its registered agent in Raleigh, NC.

14.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

15.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

16.     Experian is a foreign corporation authorized to do business in the State of North Carolina through its registered agent in Raleigh, NC.

17.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.     Experian disburses consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

19.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement

of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

20. "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

21. Over a decade ago, the Third Circuit apprised fellow CRA Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the

protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….

Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….

Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

22.     Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

23.     Section 1681i(a), on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

24.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin*

*v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

25.     It has long been the law that a CRA, such as Equifax or Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

26.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).  Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

27.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

28.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that the CRAs have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

29.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

***Plaintiff Discovers the CRA Defendants Wrongfully Reporting a Bank of America Account That Did Not Belong to Him and He Disputes Those Inaccuracies***

30.     In or around October of 2023, Plaintiff obtained copies of his credit files with the CRA Defendants and discovered that the Defendants were reporting inaccurate information about him that belonged to another person.

31.     Specifically, Defendants were inaccurately reporting that a Bank of America credit card with an "open date" of September 23, 2019 (the "Account") belonged to him.

32.     Equifax was reporting the account as "open" with a $339 balance, whereas Experian was reporting the account as "closed" with a $309 balance, $56 past due, and a "30 days late" payment history for October of 2023.

33.     The information was inaccurate. Plaintiff never opened the Account, authorized anyone to open the Account on his behalf, used the Account, or benefited from the Account.

34.     Upon information and belief, Defendants had "mixed" Plaintiff's information with that of another consumer.

35.     It was impossible for the Bank of America Account to belong to Plaintiff, because when the Bank of America Account was opened, Plaintiff had not yet been assigned a social security number.

36.     On or around November 2, 2023, Plaintiff mailed written dispute letters to the Defendant CRAs. In each letter, Plaintiff disputed the inaccurate Account that Equifax and Experian were reporting on his credit. Plaintiff included his address, his full social security number, and his full date of birth. Plaintiff included copies of his driver's license and he had each letter notarized so that the CRAs would know that he legitimately sent the disputes.

_____

9

37.     On or around November 9, 2023, Experian sent dispute results to Plaintiff, indicating that the Account was deleted from his credit.

38.     Plaintiff did not receive a timely response (or any response) from Equifax following his November 2023 dispute.

39.     Upon information and belief, Equifax did not conduct an investigation in response to Plaintiff's November 2023 dispute.

40.     Defendants are aware of the risks that "mixed files" present to consumers, and Defendants have the ability to mitigate these risks by improving their matching algorithms.

41.     Despite knowing these risks, Defendants choose not to improve their matching algorithms. This is because the CRAs' customers (like Bank of America) use information from CRAs to assess their own risks, and those customers prefer that CRAs err towards being overly inclusive of information—even when those algorithms are detrimental to consumers and result in mixed files.

### *CRA Defendant Equifax Did Not and Does Not Conduct Any Investigation of Most Consumer Disputes*

42.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax uses a vendor which was previously known as Intelenet Global Services and is now known as Teleperformance.

43.     Here is how the written mail dispute process actually works for Equifax: a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other

communication. That mailbox company receives consumer disputes and scans them into a batch with other disputes.

44.     Teleperformance uses low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

45.     Teleperformance agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

46.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

47.     In fact, both Defendants strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax or Experian. The dispute is sent to the Defendant CRAs' creditor customers (such as Bank of America) for their sole review and consideration.

48.     Equifax has taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr.

Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

49.     Regardless of whether these statements by Equifax are correct, Equifax believes that it cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

50.     Equifax itself did not conduct any reinvestigation of Plaintiff's disputes. Instead, it merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered Actual Harm*

51.     Plaintiff's credit was harmed by Defendants' inaccurate reporting, and Equifax's refusal to conduct a proper investigation of Plaintiff's dispute pursuant to Section 1681i of the FCRA.

52.     As a result of the inaccurate credit reporting and failure to conduct an adequate investigation, Plaintiff has suffered damages, including, but not limited to:

    a.  Harm to Plaintiff's credit opportunities;

    b.  Fear of being denied credit and apprehension in applying for new credit;

    c.  Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

    d.  Loss of time attempting to correct the inaccuracies;

    e.  Stress associated with attempting to resolve this matter.

f. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: depression, anxiety, nightmares, feelings of fear, harm to reputation, and loss of privacy.

### *Defendants' Conduct was Willful*

53. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

54. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

55. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. Equifax's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

56. The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

57. Each Defendant regularly receives unredacted consumer dispute details from this database.

13

58.     Since the database began accepting complaints, the CFPB has sent over a million consumer credit reporting complaints to Equifax.

59.     Since the database began accepting complaints, the CFPB has sent over a million consumer credit reporting complaints to Experian.

60.     Over 770,000 of the CFPB complaints against Equifax and over 710,000 of the CFPB complaints against Experian were regarding the CRAs reporting information on a consumer report that belonged to someone else.

61.     Further, over 270,000 of the CFPB complaints against Equifax were based largely on its failure to reasonably investigate consumer disputes.

62.     Just in the last 12 months alone, Equifax and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

63.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRAs on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

64.     The CRAs have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols.*

*LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

65.     Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

66.     Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable

reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was

a case with fellow CRA Trans Union. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.

1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a)

trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several
> occasions since 1997, decisions of federal courts have informed . . . that the Fair
> Credit Reporting Act's Requirement for a reasonable reinvestigation must consist
> of something more than simply the parroting of information received from other
> sources and/or that a credit reporting agency does not act reasonably by deferring
> entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

67.     Defendants have also been repeatedly criticized by Federal and state regulators, and

consumer groups for the refusal or failure to conduct substantive reinvestigations.

68.     In 2015, a large group of state Attorneys General forced a consent order from the

CRA Defendants by which they were required to develop procedures necessary to comply with

the FCRA.[2] The AG Settlement required amongst many changes and mandates that the Defendant

comply with § 1681i(a).

69.     The AG Settlement also required the CRA Defendants to conduct significant

research and data gathering—even creating a "working group" to address these issues, and to

develop special procedures to handle disputes as in this case. Notwithstanding these requirements,

the Defendants did not meaningfully comply with the AG Settlement in these regards.

70.     In early 2025, almost two decades after the AG settlement, the Consumer Financial

Protection Bureau sued fellow CRA Experian, seeking injunctive relief, redress, disgorgement,

and civil money penalties. In its Complaint, CFPB alleged that:

---

[2]      *Available      at*      https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

Experian violated both [the Fair Credit Reporting Act and the Consumer Financial Protection Act of 2010] by failing to reasonably reinvestigate consumer disputes challenging the accuracy or completeness of information in consumer reports, including by failing to forward all relevant information to furnishers, failing to provide adequate or accurate notice to consumers of the outcome of their disputes, and failing to utilize reasonable procedures to ensure the accuracy and completeness of information in consumers' files.

*Consumer Fin. Prot. Bureau v. Experian Information Solutions, Inc.*, 8:25cv24 (C.D. Cal. Filed Jan. 7 2025).[3]

71.     As the CFPB summarized, "Despite its obligations under the FCRA, Experian fails consumers who dispute information in their consumer reports at every step of the dispute process." *Id.*

72.     Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

73.     The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable

_____

[3] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_experian-information-solutions-complaint_2025-01.pdf
[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

74.     Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

75.     The overwhelming amount of public criticism and growing awareness of the CRAs' failures has led at least one Defendant CRA, Experian, to frequently push for arbitration in lieu of litigation. Addressing so many cases though arbitration has lowered Experian's exposure to justice through the court system. However, arbitrators recognize the substantial amount of evidence demonstrating that Experian willfully disregards the rights of consumers under the FCRA, and they are awarding damages accordingly. In Duncan v. Experian Information Solutions, Inc., which

shared many similarities to the underlying facts in this case, Experian reported inaccurate information from PNC Bank on Mr. Duncan's Experian credit report. Although Mr. Duncan disputed the information with Experian, Experian failed to conduct any actual "reinvestigation" of Mr. Duncan's disputes, as required by Section 1681i of the Federal Fair Credit Reporting Act. Instead, Experian relied entirely on the information sent to it by the "furnisher", PNC Bank. The arbitrator in the Duncan case ordered Experian to pay Mr. Duncan "for actual damages $400,000, together with $50,000 for each month it continues to report the PNC information, up to a maximum of another $300,000." The arbitrator further found Experian's violations to be willful and ordered that Experian pay Mr. Duncan $700,000 in punitive damages.

76.     Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

77.     Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)
### *against Equifax and Experian*

78.     Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

79.     Equifax and Experian both violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate Account information from Furnisher Bank of America.

80.     As a result of Equifax's and Experian's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, depression, anxiety, nightmares, feelings of fear, harm to reputation, and loss of privacy.

81.     Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Equifax ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

82.     Equifax and Experian each furnished multiple consumer reports to third parties containing the inaccurate information and they did so after receiving notice of these inaccuracies.

83.     The violations by Equifax and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

84.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
*against Equifax*

85.     Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

86. Equifax violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the items from each of Plaintiff's credit files.

87. Equifax violated 15 U.S.C. § 1681i(a)(2) by its conduct which includes, but is not limited to, failing to send to the Furnisher all relevant information that it received with Plaintiff's dispute.

88. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Furnisher account.

89. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

90. After receiving Plaintiff's November 2023 dispute letter, Equifax violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

91. As a result of Equifax's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, depression, anxiety, nightmares, feelings of fear, harm to reputation, and loss of privacy.

92. The violations by Equifax were willful, rendering Equifax liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

93.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)     Award Plaintiff actual and punitive damages for violations of the FCRA by Equifax and Experian;

(2)     Award Plaintiff attorney's fees and costs under the FCRA;

(3)     Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)     Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

**YU WU,**

/s/ Leonard A. Bennett
Leonard A. Bennett, NCSB #21576
Mark C. Leffler*
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662- Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com

*Counsel for Plaintiff*
*\*Pro hac vice forthcoming*